**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| Gordon Stevens, individually and as the representative of a class of similarly situated persons, and on behalf of the SEI Capital Accumulation Plan, <br><br> Plaintiff, <br><br> v. <br><br> SEI Investments Company, SEI Investments Management Corporation, SEI Capital Accumulation Plan Design Committee, SEI Capital Accumulation Plan Investment Committee, SEI Capital Accumulation Plan Administration Committee, and John Does 1-30, <br><br> Defendants. | Case No. <br><br> **COMPLAINT** <br> **CLASS ACTION** |

## NATURE OF THE ACTION

1.     Plaintiff Gordon Stevens, individually and as a representative of the Class described herein, and on behalf of the SEI Capital Accumulation Plan ("Plan"), brings this action under the Employee Retirement Income Security Act of 1974, as amended, 29 U.S.C. § 1001, *et seq.* ("ERISA"), against Defendants SEI Investments Company ("SEIC"), SEI Investments Management Corporation ("SIMC"), the SEI Capital Accumulation Plan Design Committee ("Design Committee"), the SEI Capital Accumulation Plan Investment Committee ("Investment Committee"), the SEI Capital Accumulation Plan Administration Committee ("Administration Committee"), and John Does 1–30 (collectively, "Defendants"). As described herein, Defendants have breached their fiduciary duties under ERISA, to the detriment of the Plan and its participants and beneficiaries, by imprudently selecting and monitoring the Plan's investment options and by retaining affiliated investment products in the Plan where doing so was not warranted by their merits relative to non-proprietary alternatives. Plaintiff brings this action to remedy this unlawful conduct and obtain other appropriate relief as provided by ERISA.

1

## PRELIMINARY STATEMENT

2.      As of the end of 2017, Americans had approximately $7.7 trillion in assets invested in defined contribution plans, such as 401(k) and 403(b) plans. *See* INVESTMENT COMPANY INSTITUTE, *Retirement Assets Total $27.9 Trillion in Fourth Quarter 2017* (Mar. 22, 2018), *available at* https://www.ici.org/research/stats/retirement/ret_17_q4. These plans are the primary retirement savings vehicle for many Americans, replacing defined benefit plans—commonly referred to as "pension plans"—predominant in previous generations. *See* DEP'T OF LABOR, *Private Pension Plans Bulletin, at 1-3* (Feb. 2018), *available at* https://www.dol.gov/sites/default/files/ebsa/researchers/statistics/retirement-bulletins/private-pension-plan-bulletins-abstract-2015.pdf.

3.      The potential for disloyalty and imprudence is much greater in defined contribution plans than in defined benefit plans. In a defined benefit plan, the participant is entitled to a fixed monthly pension payment, while the employer is responsible for making sure the plan is sufficiently capitalized, and thus the employer bears all risks related to excessive fees and investment underperformance. *See Hughes Aircraft Co. v. Jacobson*, 525 U.S. 432, 439 (1999). Therefore, in a defined benefit plan, the employer and the plan's fiduciaries have every incentive to keep costs low and to remove imprudent investments. But in a defined contribution plan, participants' benefits "are limited to the value of their own investment accounts, which is determined by the market performance of employee and employer contributions, less expenses." *Tibble v. Edison Int'l*, 135 S. Ct. 1823, 1826 (2015). Thus, the employer has no incentive to keep costs low or to closely monitor the plan to ensure every investment remains prudent, because all risks related to high fees and poorly performing investments are borne by the employees.

4.    For financial service companies like SEIC, the potential for imprudent and disloyal conduct is especially high, because the plan's fiduciaries are in a position to benefit the company through the plan by using proprietary investment products that a disinterested fiduciary would not choose.

5.    The fiduciary duties of loyalty and prudence imposed by ERISA upon retirement plan fiduciaries are critical to safeguard defined contribution plan participants. These twin fiduciary duties are "strict" and have been described as "the highest known to the law." *Solis v. Koresko*, 884 F. Supp. 2d 261, 291-92 (E.D. Pa. Aug. 2012) ("*Koresko I*"); *Donovan v. Bierwirth*, 680 F. 2d 263, 272 n. 8 (2d Cir. 1982). Fiduciaries must act "solely in the interest of the participants and beneficiaries," 29 U.S.C. § 1104(a)(1)(A), with the "care, skill, prudence, and diligence" that would be expected in managing a plan of similar character. 29 U.S.C. § 1104(a)(1)(B).

6.    Defendants have not acted in the best interest of the Plan and its participants. Instead, Defendants use the Plan to serve their own interests. Defendants offer participants **only** designated investment options that generate fees for SEIC and its affiliates (collectively, "SEI"), and treat the Plan as a captive customer of SEI in order to prop up SEI-affiliated investment products and advance SEI's business objectives. Unfortunately for Plan participants, SEI investment products are not competitive in the marketplace. Participants would have been better served if Defendants had investigated and retained non-proprietary alternatives.

7.    Although inclusion of proprietary investment options in a 401(k) plan lineup is not *per se* imprudent or disloyal, Defendants are required to evaluate each investment option within the Plan on its merits relative to alternative available investment options. In deciding which funds to include, Defendants must consider only the interest of Plan participants.

3

8.     Because SEI-affiliated investment options within the Plan have consistently generated lower net returns for investors than investment options with the same objectives available outside of SEI, there was no reason (other than self-interest) for Defendants to offer solely SEI-affiliated options within the Plan. Indeed, no other defined contribution plan in the country with $250 million in assets or more consists exclusively of SEI-affiliated investment products, and the vast majority of similarly-sized plans do not include any SEI-affiliated investments.[1] Given the relative lack of merit of SEI-affiliated investment products, the unpopularity of those products in the fiduciary marketplace, and Defendants' financial and business conflicts of interest, it is reasonable to infer that Defendants' process for the selection, monitoring, and retention of Plan investments was deficient and self-serving.

9.     Defendants' mismanagement of the Plan's investment lineup and prioritization of SEI's business interests over the interests of participants and beneficiaries of the Plan constitutes a breach of the fiduciary duties of prudence and loyalty in violation of 29 U.S.C. § 1104. As a result of Defendants' violations of ERISA, the Plan has suffered millions of dollars in losses.

10.     To remedy Defendants' unlawful conduct, Plaintiff assert claims against Defendants for breach of the fiduciary duties of loyalty and prudence (Count One) and failure to monitor fiduciaries (Count Two).

## JURISDICTION AND VENUE

11.     Plaintiff brings this action pursuant to 29 U.S.C. § 1132(a)(2) and (3), which provide that participants in an employee retirement plan may pursue a civil action on behalf of the plan to remedy breaches of fiduciary duties and other prohibited conduct, and to obtain

---

[1] In fact, none of the SEI-affiliated investment options in the Plan (other than the stable value fund) are held by any defined contribution plans with over $250 million in assets. *See infra,* at ¶ 48.

4

monetary and appropriate equitable relief as set forth in 29 U.S.C. §§ 1109 and 1132.

12.     This case presents a federal question under ERISA, and therefore this Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 and 29 U.S.C. § 1132(e)(1)(F).

13.     Venue is proper pursuant to 29 U.S.C. § 1132(e)(2) and 28 U.S.C. § 1391(b) because this is the district where the Plan is administered, where the breaches of fiduciary duties giving rise to this action occurred, and where Defendants may be found.

## THE PARTIES

### PLAINTIFF

14.     Plaintiff resides in Phoenixville, Pennsylvania (Chester County), and had an account in the Plan from 2014 to 2017. His account was invested in the SEI Target Date 2030 Fund. Through his investment in the SEI Target Date 2030 Fund, which is a fund of funds, Plaintiff also was invested in more than a dozen other SEI-affiliated funds, more than half of which were included in the Plan as designated investment alternatives. Plaintiff's account suffered losses as a result of Defendants' fiduciary breaches, and would have been worth more at the time it was distributed from the Plan had Defendants not violated ERISA as described herein. Further, SEI has been unjustly enriched as a result of Plaintiff's investment in the SEI Target Date 2030 Fund.

### THE PLAN

15.     The Plan was established by SEIC and went into effect in 1983. The Plan is an "employee pension benefit plan" within the meaning of 29 U.S.C. § 1002(2)(A) and a "defined contribution plan" within the meaning of 29 U.S.C. § 1002(34). The Plan is a qualified plan under 26 U.S.C. § 401, commonly referred to as a "401(k) plan."

16.     The Plan covers eligible employees and former employees of SEI. Eligible employees saving for retirement may contribute a percentage of their earnings on a pre-tax basis to the Plan. Employees also may receive tax-deferred contributions from SEI.

17.     Plan participants may direct their accounts to one or more designated investment alternatives offered by Defendants. Defendants have only offered investments affiliated with SEI.

## DEFENDANTS

18.     Defendant SEIC is a provider of investment processing, investment management, and investment operations platforms headquartered in Oaks, Pennsylvania. SEIC is the "plan sponsor" within the meaning of 29 U.S.C. § 1002(16)(B), and a "named fiduciary" of the Plan under 29 U.S.C. § 1102(a)(2). SEIC, acting at all relevant times through its Board of Directors, receives periodic reports from the Investment Committee on the performance of the Plan's investment options. SEIC also appoints members of the Design Committee, and has the option to appoint members of the Administration Committee. In addition, SEIC has the option to receive reports from the Administration Committee or the Design Committee regarding the overall operation and administration of the Plan. Based on its duties and authority with respect to the Plan, SEIC is a fiduciary under 29 U.S.C. § 1002(21)(A)(i) and (iii).

19.     Defendant SIMC is a registered investment advisor firm and an indirect subsidiary of SEIC. SIMC is the Plan's fiduciary investment advisor.  In this role, SIMC advises other Plan fiduciaries with respect to the Plan's investment menu. SIMC also performs investment advisory services for SEI's proprietary funds, including proprietary funds that are offered within the Plan, and earns profits in the form of investment management fees for the

performance of those services. Based on its duties with respect to the Plan and the Plan's investments, SIMC is a fiduciary under 29 U.S.C. § 1002(21)(A)(ii).

20.     Defendant Design Committee is a committee of SEI employees appointed and overseen by SEIC. The Design Committee is a "named fiduciary" of the Plan under 29 U.S.C. § 1102(a)(2). The Design Committee appoints members of the Investment Committee, and has authority to appoint members of the Administration Committee, to the extent such members are not appointed directly by SEIC. The Design Committee also has authority to remove members appointed to the Investment Committee and Administration.  In addition, the Design Committee may require the Investment Committee and Administration Committee to report on their activities as needed, and must do so at least once per year.  Based on its duties with respect to the Plan, the Design Committee is a fiduciary under 29 U.S.C. § 1002(21)(A)(i) and (iii).

21.     Defendant Investment Committee is a committee of SEI employees appointed and overseen by the Design Committee. The Investment Committee is a "named fiduciary" of the Plan under 29 U.S.C. § 1102(a)(2). The Investment Committee has the responsibility and authority to: select, monitor, review, replace or remove the investment options within the Plan; report on the performance of the Plan's investment options to SEIC; and acquire, manage, and dispose of Plan assets. Based on its duties with respect to the Plan, the Investment Committee is a fiduciary under 29 U.S.C. § 1002(21)(A)(i)-(iii).

22.     Defendant Administration Committee is a committee of SEI employees appointed and overseen by the Design Committee or SEIC. The Administration Committee is a "named fiduciary" of the Plan under 29 U.S.C. § 1102(a)(2). The Administration Committee has various Plan maintenance and administration duties, including keeping Plan records, providing Plan records to other fiduciaries, and hiring Plan service providers (including SIMC as the Plan's

fiduciary investment advisor). Based on its duties and authority with respect to the Plan, the Administration Committee is a fiduciary under 29 U.S.C. § 1002(21)(A)(i) and (iii).

23.     Defendants possessed the ability to delegate their fiduciary responsibilities to any other person, persons, or entity. Any individual or entity not named in this Complaint to whom Defendants delegated fiduciary functions or responsibilities are also fiduciaries of the Plan under 29 U.S.C. §§ 1002(21)(A) and 1105(c)(2). Because any such individuals that have been delegated fiduciary responsibilities are not currently known to Plaintiff, they are collectively named in this Complaint as John Does 1-30 or "the John Doe Defendants."

24.     Each Defendant identified above as a Plan fiduciary is also subject to co-fiduciary liability under 29 U.S.C. § 1105(a)(1)–(3) because it enabled other fiduciaries to commit breaches of fiduciary duties, failed to comply with 29 U.S.C. § 1104(a)(1) in the administration of its duties, and/or failed to remedy other fiduciaries' breaches of their duties, despite having knowledge of the breaches.

## ERISA FIDUCIARY DUTIES

25.     ERISA recognizes "that the continued well-being and security of millions of employees and their dependents are directly affected by [retirement] plans." 29 U.S.C. § 1001(a). Thus, "[t]he principal object of the statute is to protect plan participants and beneficiaries." *Boggs v. Boggs*, 520 U.S. 833, 845 (1997) (citation omitted). The "crucible of congressional concern was misuse and mismanagement of plan assets by plan administrators" and "ERISA was designed to prevent these abuses." *Mass. Mut. Life Ins. Co. v. Russell*, 473 U.S. 134, 140 n.8 (1985) (citing extensive legislative history).

26.     To protect plan participants, ERISA incorporates the twin fiduciary duties of loyalty and prudence. *See* 29 U.S.C. § 1104(a)(1). These fiduciary duties are "strict" and "the

highest known to the law." *Koresko I*, 884 F. Supp. at 291-92; *Bierwirth*, 680 F. 2d at 272 n. 8 (2d Cir. 1982).

## DUTY OF LOYALTY

27.      The duty of loyalty requires fiduciaries to act "solely in the interest of the participants and beneficiaries," 29 U.S.C. § 1104(a)(1), with "an eye single" to the interests of plan participants. *Pegram v. Herdrich*, 530 U.S. 211, 235 (2000); *see also Reich v. Compton*, 57 F. 3d 270, 291 (3d Cir. 1995) (fiduciaries "violate their duty of loyalty when they act in the interests of the plan sponsor"). "A decision to make an investment may not be influenced by [other] factors unless the investment, when judged solely on the basis of its economic value to the plan, would be equal or superior to alternative investments available to the plan." Dep't of Labor ERISA Adv. Op. 88-16A, 1988 WL 222716, at *3 (Dec. 19, 1988).

28.      A plan fiduciary cannot, consistent with the duty of loyalty, act with "its own interests mind." *Huffman v. Prudential Ins. Co. of Am.*, 2017 WL 6055225, at *8 (E.D. Pa. Dec. 7, 2017. Maintaining "complete and undivided loyalty" to participants and beneficiaries is the "cardinal obligation of a fiduciary." *Perez v. Koresko*, 86 F. Supp. 3d 293, 383 (E.D. Pa. 2015) ("*Koresko II*"), *aff'd sub nom. Sec'y U.S. Dept. of Labor v. Koresko*, 646 Fed. Appx. 230 (3d Cir. 2016).

## DUTY OF PRUDENCE

29.      The duty of prudence requires fiduciaries to exercise the "care, skill, prudence, and diligence" that a prudent person would utilize in managing a similar plan." 29 U.S.C. § 1104(a)(1)(B). This is not a lay person standard, but instead "requires expertise in a variety of areas, such as investments." Dep't of Labor, *Meeting Your Fiduciary Responsibilities* (Sept.

2017), at 2, *available at* https://www.dol.gov/sites/default/files/ebsa/about-ebsa/our-activities/resource-center/publications/meeting-your-fiduciary-responsibilities.pdf.

30.     The duty of prudence applies to the initial selection of a plan's investment options, and also entails a "continuing duty to monitor [plan] investments and remove imprudent ones." *Tibble*, 135 S. Ct. at 1828. When deciding whether to select, retain, or remove a plan investment, the duty of prudence requires that fiduciaries "employ[] … appropriate methods to investigate and determine the merits of … [the] investment." *In re Unisys Sav. Plan Litig.*, 74 F.3d 420, 434 (3d Cir. 1996). The duty to conduct an "independent investigation" of the merits of each investment is "the most basic of ERISA's investment fiduciary duties." *Id.* at 435.

## PRUDENT AND LOYAL MANAGEMENT OF A DEFINED CONTRIBUTION PLAN INVESMENT MENU

31.     In a defined contribution plan, fiduciaries are obligated to assemble a diversified menu of investment options for participants. 29 U.S.C. § 1104(a)(1)(C); 29 C.F.R. § 2550.404c-1(b)(1)(ii). A plan's "designated investment alternatives" are the options designated by the fiduciaries "into which participants and beneficiaries may direct the investment of assets held in, or contributed to, their individual accounts." 29 C.F.R. § 2550.404a-5(h)(4). Fiduciaries must comply with ERISA's duties of prudence and loyalty in the selection and monitoring of the designated investment alternatives on the plan menu. *See* 29 C.F.R. § 2550.404c-1(d)(2)(iv).

32.     The investment options available to a fiduciary will vary based on the amount of assets the fiduciary has under its control.  The investment marketplace works on economies of scale. The more assets a fiduciary has to invest, the more options the fiduciary will have with respect to fund managers, pricing, and fund structures. As a result, the ERISA regulations embrace plan size as a factor for evaluating fiduciary decision-making. *Rules and Regulations for Fiduciary Responsibility; Investment of Plan Assets Under the "Prudence" Rule*, 44 Fed.

Reg. 37221, 37224 (June 26, 1979) (stating that "a fiduciary of a plan with assets of $50,000" would not be expected to use "the same investment management techniques as would a fiduciary of a plan with assets of $50,000,000").

33.     Each designated investment alternative is generally a pooled investment vehicle—which includes mutual funds, collective investment trust funds (CIT funds),[2] and separate accounts—offering exposure to a particular asset class or sub-asset class, or a mix of asset classes. INVESTMENT COMPANY INSTITUTE, *The BrightScope/ICI Defined Contribution Plan Profile: A Close Look at 401(k) Plans*, at 8 (Mar. 2018), *available at* www.ici.org/pdf/ppr_18_dcplan_profile_401k.pdf ("2018 ICI Study"); Ian Ayres & Quinn Curtis, *Beyond Diversification: The Pervasive Problem of Excessive Fees and "Dominated Funds" in 401(k) Plans*, 124 Yale L.J. 1476, 1485 (2015) ("*Beyond Diversification*"). Every pooled investment product charges certain fees and expenses that are paid by deductions from the pool of assets in transactions that typically occur on a monthly or quarterly basis.

34.     The broad asset classes generally include fixed investments, bonds, stocks, real estate, and commodities. Stable value funds, guaranteed investment contracts, and money market funds are examples of fixed investments. Bonds are debt securities, which are generally categorized by the issuer/borrower (U.S. Government, foreign governments, municipalities, corporations), the duration of the debt (repayable anywhere between 1 month and 30 years), and the default risk associated with the particular borrower. Equity (or "stock") investments obtain ownership shares of companies in anticipation of income from corporate dividends or appreciation in the value of the company.

---

[2] A CIT fund is a pooled investment vehicle available to employee benefit plans that is administered by a national or state bank or trust company and exempt from registration with the U.S. Securities and Exchange Commission (SEC).

35.     Equity investments are generally defined by three characteristics: (1) where the investment managers invest geographically (*i.e.*, whether they invest in domestic or international companies, or both); (2) the size of companies they invest in (generally categorized as small cap, mid cap, or large cap); and (3) their investment style, *i.e.* growth, value, or blend (growth funds invest in fast-growing companies, value funds look for more conservative or established stocks that are more likely to be undervalued, and blend funds invest in a mix of growth stocks, value stocks, and companies in between).

36.     Balanced funds are a type of fund that invests in a mix of asset classes. Target date funds represent a particular type of balanced fund. A target date fund is a diversified investment fund that provides exposure to a variety of asset classes, comprised mostly of equity and fixed income securities, with an investment mix that changes to become more conservative as the fund's target (retirement) date approaches. Target date funds are generally offered as a suite of funds with target dates staggered 5 to 10 years apart, allowing the participant to choose the target date that aligns with his or her estimated retirement date. Target date funds typically use a "fund of funds" structure, meaning that each fund invests in other pooled invested vehicles in proportions determined by the manager of the funds.

37.     Target date funds are associated with the "set it and forget it" approach to investing by retirement plan participants. Participants investing a portion of their account in a target date fund typically do not expect to change their selection over time. Instead, participants rely on the manager-driven rebalancing of the fund to implement a sound investment strategy for their account over their retirement saving horizon. Approximately 51% of participants in defined contribution plans invest their entire account balance in a single target-date fund. *See*

MONEYWATCH, *Over half of 401(k) savers invest in one kind of fund* (Aug. 6, 2018), *available at* https://www.cbsnews.com/news/over-half-of-401k-savers-invest-in-one-kind-of-fund.

38.     All designated alternatives can be either passively or actively managed. Passive funds, popularly known as "index funds," seek to replicate the performance of market indices, such as the S&P 500, by purchasing a portfolio of securities matching the composition of the index itself. James Kwak, *Improving Retirement Savings Options for Employees*, 15 U. Pa. J. Bus. L. 483, 493 (2013). By following this strategy, index funds produce returns that are very close to the market segment tracked by the index. *Id.* Index funds therefore offer predictability, diversified exposure to a particular asset or sub-asset class, and low expenses. *Id.* Actively-managed funds, on the other hand, pick individual stocks and bonds within a particular asset or sub-asset class and try to beat the market through superior investment selection. *Id.* at 485–86. Actively managed funds are typically more expensive than index funds, but offer the potential to outperform the market (although this potential is typically not realized). DEP'T OF LABOR, *Understanding Retirement Plan Fees and Expenses*, at 9 (Dec. 2011), *available at* http://www.dol.gov/ebsa/pdf/undrstndgrtrmnt.pdf.

39.     A self-directed brokerage account ("SDBA") option is not a designated investment alternative, but fiduciaries may offer an SDBA option to permit investments outside the designated investment alternatives. 29 C.F.R. § 2550.404a-5(h)(4). An SDBA option gives participants access to an array of thousands of additional stocks, bonds, and mutual funds. *Beyond Diversification* at 1524. However, SDBAs have significant drawbacks and are used by only a small percentage of retirement plan participants.[3] The existence of an SDBA option does

---

[3] Assets held in SDBAs account for only 3% of assets within the Plan, according to the Plan's most recent Form 5500 filing, in line with national rates. *See* INVESTMENT COMPANY INSTITUTE & DELOITTE CONSULTING LLP, *Inside the Structure of Defined Contribution/401(k) Plan Fees*, at 15 (Aug. 2014), *available at* https://www.ici.org/pdf/rpt_14_dc_401k_ fee_study.pdf (SDBAs

not excuse plan fiduciaries from constructing and maintaining a prudent and appropriate menu of designated investment alternatives. *See DiFelice v. U.S. Airways, Inc.,* 497 F.3d 410, 423 (4th Cir. 2007) ("[A] fiduciary cannot free himself from his duty to act as a prudent man simply by arguing that other funds … could theoretically … create a prudent portfolio.").

40.     With respect to designing the menu of designated investment alternatives, a substantial body of academic and financial industry literature provides that fiduciaries must carefully tend to their duty of investment menu construction—selecting prudent investments, regularly reviewing plan options to ensure that investment choices remain prudent, and weeding out costly or poorly-performing investments. Plan participants often engage in "naive diversification," whereby they attempt to diversify their holdings simply by spreading their money among the available funds. Jill E. Fisch & Tess Wilkinson-Ryan, *Why Do Retail Investors Make Costly Mistakes?*, 162 U. PA. L. REV. 605, 636–38 (2014) (hereinafter "*Costly Mistakes*"); Shlomo Benartzi & Richard H. Thaler, *Naive Diversification Strategies in Defined Contribution Plans*, 91 AM. ECON. REV. 79, 96 (2001).

41.     Additionally, once an initial investment allocation has been chosen, 401(k) participants are prone to inertia, failing to reassess their investment decisions even when presented with evidence suggesting that they should. John Ameriks & Stephen P. Zeldes, *How

---

represent about 2% of retirement plan assets). Fiduciaries are under no obligation to disclose performance, benchmark, or fee information regarding the investments available within an SDBA, and SDBA investments are not subject to the same fiduciary monitoring duties as a plan's designated investment alternatives. *See* 29 C.F.R. § 2550.404a-5(d), h(4); *id.*, § 2550.404c-1(d)(2)(iv). SDBA participants, including participants in the Plan, also may be assessed an account fee, a fee for each trade, and additional fees associated with servicing each investment option—which would not be charged in connection with investments included among a plan's designated investment alternatives. *See* DEP'T OF LABOR, *Field Assistance Bulletin 2012-02R* (July 30, 2012), *available at* https://www.dol.gov/agencies/ebsa/employers-and-advisers/guidance/field-assistance-bulletins/2012-02r. Participants typically fare worse utilizing SDBAs than sticking to designated investment alternatives. *See* Dr. Gregory Kasten, *Self-Directed Brokerage Accounts Reduce Success*, at 1, 13–14 (2004), *available at* http://etf.wi.gov/boards/agenda_items_2004/dc20040819item4.pdf.

*Do Household Portfolio Shares Vary with Age?*, at 31, 48, Columbia University Working Paper (Sept. 2004) (finding that 48 percent of participants in sample made no changes to their account in ten years and 73 percent of participants made no change to their asset allocation); Julie Agnew *et al.*, *Portfolio Choice and Trading in a Large 401(k) Plan*, 93 Amer. Econ. Rev. 193, 194 (Mar. 2003) (finding that 87 percent of 401(k) account holders made no trades in the average year and that the average 401(k) investor makes one trade every 3.85 years). For these reasons, prudent fiduciaries will limit their menus to only those funds that represent sound long-term investments. The fact that participants exercise "independent control" over the assets in their accounts "does not serve to relieve a fiduciary from its duty to prudently select and monitor any … designated investment alternative offered under the plan." 29 C.F.R. § 2550.404c-1(d)(1)(iv).

42.     Financial services companies possess no special insight that allows them to identify which of their own funds are likely to outperform. Though financial companies may favor retention of their own funds, this favoritism has empirically resulted in worse performance. *See* Veronica Pool et al., *It Pays the Menu: Mutual Fund Investment Options in 401(k) Plans*, 71 J. OF FIN. 1779 (Aug. 2016). A study of third-party administrators similarly shows that plans administered by asset management firms tend to have the lowest net returns, and that those lower returns are attributable to reliance on proprietary funds. Thomas Doellman & Sabuhi Sardarli, *Investment Fees, Net Returns, and Conflict of Interest in 401(k) Plans*, 39 J. OF FIN. RES. 5 (Spring 2016).

43.     Whether fiduciaries have managed a plan's investment menu consistent with their fiduciary duties "depends on the alternatives available to the fiduciary to accomplish the same purpose, in light of all the other relevant information about the investments." *Goldenberg v. Indel, Inc.*, 741 F. Supp. 2d 618, 635 (D.N.J. 2010). If fiduciaries offer funds that "charged

higher fees and had lower historical returns" compared to available funds that would have accomplished the same purpose, and if the only "appreciable reason" for offering the inferior funds was the benefit of a party other than plan participants, "the proper process was not followed." *Id.* at 633-34, 640.

## DEFENDANTS' VIOLATIONS OF ERISA

**I.**     **DEFENDANTS USED A DISLOYAL AND IMPRUDENT PROCESS TO MANAGE THE PLAN'S INVESTMENT MENU.**

*SEI's Business and Proprietary Funds*

44.     SEI develops business solutions for financial services companies. Over time, SEI has also developed proprietary investment products. Although SEI originally designed its proprietary investment products for its bank clients, SEI has more recently offered proprietary investment products to retirement plan sponsors and other institutional investors. Consistent with its core business focus, SEI provides support services to its proprietary funds, but sub-contracts most of the actual investment management work to outside firms.

45.     SEI is not reputed to offer specialized investment strategies, or possess superior investment manager research or selection skills. SEI's proprietary funds employ common investment strategies that can be found in a large number of non-proprietary alternatives. SEI also selects investment managers based on its business relationships, not unbiased investigations of the marketplace. SEI favors firms in whom SEIC has a financial stake, firms that do business with SEI's partners, and firms that use SEI's services in connection with their own proprietary products and services.

46.     The results achieved by SEI's proprietary mutual funds demonstrate SEI's lack of investment management acumen. Indeed, SEI's mutual funds have consistently been ranked

among the worst for sustained investment performance (by financial industry observer *Barron's*) over the last ten years.

**Illustration 1: Barron's Mutual Fund Family Performance Rankings for SEI, Last Ten Years**

|  | 5-Year Performance | 10-year Performance |
|---|---|---|
| **2008** | 52nd out of 53 (52/53) | 48/48 |
| **2009** | 54/54 | 47/48 |
| **2010** | 52/53 | 45/46 |
| **2011** | 52/53 | N/A |
| **2012** | 49/53 | 46/46 |
| **2013** | 41/55 | 48/48 |
| **2014** | 31/56 | 44/48 |
| **2015** | 20/58 | 50/52 |
| **2016** | 36/54 | 51/53 |
| **2017** | 44/55 | 45/50 |

47.     A mutual fund company with consistently low rankings is likely to have an inferior research and management infrastructure in place, making future underperformance highly likely. Poor historical performance also demonstrates that a firm like SEI that relies on outside managers has no demonstrable skill in identifying high-quality investment managers. Robert C. Jones and Russ Wermers, *Active Management in Mostly Efficient Markets*, Financial Analysts Journal, Vol. 67, No. 6 (Nov/Dec 2011): 34, 38 (finding that mutual fund companies whose funds have performed poorly in the past are likely to have funds that underperform in the future). SEI's low mutual fund rankings reflect poorly on both SEI's mutual funds and CIT funds, as SEI's CIT funds primarily invest in underlying SEI mutual funds.

48.     SEI's funds also have been widely rejected by fiduciaries of other plans in the "large plan" segment of the marketplace occupied by the Plan.[4] In every asset class except stable

---

[4] Since 2011, the Plan has had between $225 million and $420 million in assets, and between 2,600 and 3,400 participants. As of the end of 2015, 4,911 defined contribution plans had more than 2,500 participants (out of 648,252), and 2,511 had more than $250 million in assets. U.S.

value, the Plan is the <u>only</u> defined contribution plan with more than $250 million in assets to invest in any of the SEI CIT funds or SEI mutual funds that are offered in the Plan.[5]

### *Defendants' Imprudent and Self-Serving Management of the Plan's Investment Menu*

49.     Despite SEI's inability to generate competitive long-term returns or attract other large defined contribution plan investors, Defendants have exclusively selected and retained SEI-affiliated funds within the Plan. A prudent and loyal fiduciary would not have managed the Plan's investment lineup in this manner.

50.     As illustrated below, Defendants offered participants 19 SEI funds and SEIC stock as designated investment alternatives as of the end of 2011. Since then, Defendants have only added more SEI-affiliated funds, and have not subtracted any options. One addition, the PIMCO[6] Stable Income Fund, is not branded with the "SEI" name, but SEI is a partner in the management of the fund, and receives fees from the fund. The continuity of the menu and strict reliance on SEI-affiliated products (despite their low performance rankings) suggests that Defendants have selected and retained SEI-affiliated funds by default, in lieu of conducting an impartial investigation of options available in the marketplace.

---

DEP'T OF LABOR, *Private Pension Plan Bulletin*, at 11-12 (Feb. 2018), *available at* https://www.dol.gov/sites/default/files/ebsa/researchers/statistics/retirement-bulletins/private-pension-plan-bulletins-abstract-2015.pdf.
[5] Based on review of the most recent annual Form 5500 reports available.
[6] PIMCO is Pacific Investment Management Company LLC, an investment management firm based in Newport Beach, California. For further discussion of the PIMCO Stable Income Fund, *see infra*, at ¶¶ 54-55.

**Illustration 2: Plan Menu Since 2011 (Changes in Bold)**

| 2011 | Most Recent[7] |
|---|---|
| **CIT Funds**<br>SEI Stable Asset Fund<br>SEI Core Fixed Income Fund<br>SEI Large Cap Fund<br>SEI Small Cap Fund<br>SEI World Equity ex-US Funds<br>SEI Retirement Income Fund<br>SEI Target Date 2010 Fund<br>SEI Target Date 2015 Fund<br>SEI Target Date 2020 Fund<br>SEI Target Date 2025 Fund<br>SEI Target Date 2030 Fund<br>SEI Target Date 2035 Fund<br>SEI Target Date 2040 Fund<br>SEI Target Date 2045 Fund<br>SEI Target Date 2050 Fund<br><br>**Mutual Funds**<br>SEI U.S. Managed Volatility Fund<br>SEI High Yield Bond Fund<br>SEI Real Return Fund<br>SEI Emerging Markets Debt Fund<br><br>**Stock**<br>SEI Common Stock | **CIT Funds**<br>**PIMCO Stable Income Fund**<br>SEI Core Fixed Income Fund<br>SEI Large Cap Fund<br>SEI Small Cap Fund<br>**SEI S&P 500 Index Fund**<br>SEI World Equity ex-US Funds<br>SEI Retirement Income Fund<br>SEI Target Date 2010 Fund<br>SEI Target Date 2015 Fund<br>SEI Target Date 2020 Fund<br>SEI Target Date 2025 Fund<br>SEI Target Date 2030 Fund<br>SEI Target Date 2035 Fund<br>SEI Target Date 2040 Fund<br>SEI Target Date 2045 Fund<br>SEI Target Date 2050 Fund<br>**SEI Target Date 2055 Fund**<br>**SEI Target Date 2060 Fund**<br><br>**Mutual Funds**<br>SEI U.S. Managed Volatility Fund<br>SEI High Yield Bond Fund<br>SEI Real Return Fund<br>**SEI Multi-Asset Accumulation Fund**<br>SEI Emerging Markets Debt Fund<br><br>**Stock**<br>SEI Common Stock |

51.     If Defendants had diligently and selflessly evaluated the Plan's investment menu at the start of the class period (in the third quarter of 2012), there was cause for alarm. The Plan's two largest holdings (the SEI Large Cap Fund and the SEI Small Cap Fund), which accounted for approximately 30% of the Plan's total assets, had underperformed their stated benchmarks

---

[7] The Plan's most recent Form 5500 report includes investment holdings as of the end of 2016.

over the prior 1-, 3-, 5-, and 10-year periods.[8] These funds employ common investment strategies, and numerous comparable non-proprietary alternatives that met or exceeded their benchmarks over the same periods while charging lower or comparable fees were available to Defendants. A prudent and loyal fiduciary would have investigated alternative options in the marketplace and replaced these underperforming SEI funds with similar funds that had successful long-term track records. Yet, Defendants made no change, to the detriment of Plan participants. As of the end of 2017, these funds trailed their benchmarks over the prior 1-, 3-, 5-, and 10-year periods once again.

52.     Defendants' judgment also has been compromised with respect to target date funds. When SEI initially launched its proprietary target date funds, the funds were promptly added to the Plan, despite having no performance records. Since then, they have gained little traction in the marketplace. This has caused SEI to depend on the Plan to prop up the funds; indeed, the Plan has accounted for 27% to 31% of the total assets in SEI's target date funds since 2012. An impartial and prudent fiduciary in Defendants' position would have investigated other options, and would not have retained these proprietary target date funds. Defendants could have obtained higher net returns for participants at comparable levels of risk with alternative target date products, or by exploring a custom target date solution using an experienced target date manager outside of SEI. Defendants, however, have been constrained by SEI's interest in preserving assets under management, marketability, and revenue associated with the Plan's investment in proprietary target date funds. Tethering the Plan to proprietary target date funds has resulted in substantial losses to the Plan and participants in the Plan.

---

[8] Underperformance data includes the returns of the underlying SEI mutual funds prior to the launch of the CIT versions of these funds in 2009.

53.     Defendant SIMC likewise breached its fiduciary duties in the selection and retention of the underlying investments of SEI's target date funds. SEI's target date funds are "funds-of-funds", meaning that each SEI target date fund invests in other pooled funds. As the advisor to SEI's target date funds, Defendant SIMC selects the underlying funds that make up each fund, and is serving in a fiduciary capacity when it performs that task. In this capacity, Defendant SIMC has only considered SEI mutual funds.  However, SEI's mutual funds did not warrant this preference. *See supra*, at ¶¶ 46-47. An impartial and prudent investment fiduciary employing the same target date strategy would not have used solely SEI mutual funds, and participants would have earned higher net returns as a result.

54.     The Plan menu changes that Defendants made also suggest that Defendants' fiduciary processes were deficient. SEI closed the SEI Stable Asset Fund in November 2012, and Defendants replaced that option in the Plan with the newly-launched PIMCO Stable Income Fund. Although the new fund name may suggest otherwise, SEI simply made a change in its stable value business, and Defendants followed suit. SEI serves the same trustee role for the PIMCO-branded fund that it served for the SEI-branded fund. In industry press, SEI cited receiving better terms with PIMCO as the reason for creating the new stable value product.[9]

55.     Defendants should have done more to select a new stable value option than tag along with SEI's new business deal. A prudent and loyal fiduciary would have conducted a review of replacement options available in the marketplace. Based on information available at the time, the incipient PIMCO Stable Income Fund was not the best choice for participants. Indeed, out of 982 plans invested in the SEI Stable Asset Fund prior to its closure, only 62

---

[9] Robert Steyer, *Stable value industry: Either boom or bust* (PENSIONS & INVESTMENTS Oct. 29, 2012), *available at* http://www.pionline.com/article/20121029/PRINT/310299978/stable-value-industry-either-boom-or-bust. Additionally, SEI's partner in the SEI Stable Asset Fund, Dwight Asset Management, underwent a significant organizational change in 2012 after being acquired by Goldman Sachs.

moved to the new PIMCO fund, despite SEI's efforts to marshal clients to its new venture. The PIMCO fund lacked a track record, whereas numerous stable value options with long term records of successful performance were available.[10] For example, the Plan's recordkeeper, Wells Fargo, offers a stable value fund with a decades-long track record of successful performance. As illustrated below, the PIMCO fund had a slow start, and Plan participants would have been better served if Defendants had selected an established stable value fund:

**Illustration 3: PIMCO Stable Income Fund vs. Stable Value Marketplace[11]**

|      | PIMCO Stable Income Fund | Wells Fargo Stable Return Fund | Hueler Index |
|------|--------------------------|-------------------------------|--------------|
| 2013 | 0.45% | 1.75% | 1.84% |
| 2014 | 0.46% | 1.55% | 1.69% |
| 2015 | 0.77% | 1.73% | 1.77% |
| 2016 | 1.41% | 1.85% | 1.79% |
| 2017 | 1.81% | 1.98% | 1.95% |

56.   In 2014, Defendants added the SEI Multi-Asset Accumulation Fund to the Plan's menu. This fund was launched in 2012, and did not have a 3-year performance track record at the time that Defendants added it to the Plan. Plan participants would have better served if Defendants heeded standard fiduciary practices, *see supra*, at n. 10, and stayed away from this unproven fund. The fund significantly underperformed its custom benchmark[12] between the inception of the fund and the end of 2013, driven by an abysmal 2013 during which the fund

---

[10] Defined contribution plan fiduciaries typically require a track record of at least three years before a fund may be offered to participants.  Defendants ignored this guideline multiple times during the statutory period, to the detriment of Plan participants.

[11] This chart compares the returns of the PIMCO and Wells Fargo stable value funds in each full year after the launch of the PIMCO fund. The chart also includes the Hueler index, which represents the average return of 16 large stable value funds (including Wells Fargo and, since 2016, PIMCO).

[12] The fund's custom benchmark was specifically designed by SEI to more accurately reflect the fund's strategy than broad-based indices.

unperformed its custom benchmark by 15.21%. The fund has continued to underperform since 2013, with all positive performance over short periods subsumed by another disastrous year in 2015, during which the fund lost 7.45% while its custom benchmark gained 1.83%. Yet, Defendants added this unproven fund to the Plan in 2014, and did not replace or remove it when its underperformance persisted.

57.     Defendants also added the SEI S&P 500 Index Fund to the Plan's menu in 2014. This passively-managed fund mimics the performance of the S&P 500. Because other S&P 500 index funds in the marketplace have the same objective, the most important factor in deciding between these index funds is low fees. Despite the paramount importance of fees in determining investor returns, Defendants chose SEI's proprietary S&P 500 index fund, which is more expensive than other S&P 500 index funds that Defendants could have selected. There was no reason, other than self-interest, to select the higher cost proprietary version. Indeed, there is not a single plan (other than the SEI Plan) with $250 million in assets or more that offers SEI's S&P 500 index fund.  By contrast, hundreds of plans of that size utilize an S&P 500 fund from Vanguard (the market leader).

58.     These are just illustrative examples.  Defendants' management of the Plan's investment menu reflects routine disregard for the interest of Plan participants. In Defendants' approach to the menu as a whole, and in decisions to add or retain specific funds, Defendants' process for managing the lineup was deficient and gave improper preference to SEI funds over other, more appropriate investment alternatives. Defendants' malfeasance constituted breaches of fiduciary duty under ERISA. Compared to a prudently selected portfolio of investments designed to put participants' interests first, the Plan has suffered millions of dollars of investment losses as a result of Defendants' breaches of fiduciary duty.

## II.  PLAINTIFF LACKED KNOWLEDGE OF DEFENDANTS' CONDUCT AND PRUDENT ALTERNATIVES.

59.     Plaintiff did not have knowledge of all material facts (including, among other things, the investment option and menu choices of fiduciaries of similar plans, the absence of SEI products in similar plans, fiduciary guidelines with respect to selection and monitoring of 401(k) menu options, expert studies on the persistence of investment underperformance, SEI's reliance on the Plan to prop up SEI funds, or the existence of superior non-proprietary options that utilize the same investment strategies as SEI-affiliated funds) necessary to understand that Defendants breached their fiduciary duties until shortly before this suit was filed. Further, Plaintiff did not have actual knowledge of the specifics of Defendants' decision-making processes with respect to the Plan (including Defendants' processes for selecting, monitoring, evaluating and removing Plan investments), because this information is solely within the possession of Defendants prior to discovery. For purposes of this Complaint, Plaintiff has drawn reasonable inferences regarding these processes based upon (among other things) the facts set forth above.

60.     Documents and information relating to the management of the Plan during the relevant time (such as meeting minutes, committee charters, internal communications among members of the SEIC Board of Directors and the committee Defendants, periodic investment reviews, investment policy statements, vendor contracts, and requests for proposals relating to any investment manager or fund searches) are not available prior to discovery. Although 29 U.S.C. § 1024(b)(4) requires plan administrators to make certain Plan governance documents available to plan participants upon written request, this provision does not include records of the day-to-day management of the Plan. *See Brown v. Am. Life Holdings, Inc*., 190 F.3d 856, 861-62 (8th Cir. 1999) (collecting cases); *see also Gashlin v. Prudential Ins. Co. of Am. Ret. Sys. for*

24

*U.S. Employees & Special Agents*, 286 F. Supp. 2d 407, 423 (D.N.J. 2003) (finding that 29 U.S.C. § 1024(b)(4) only requires plan administrators to provide formal documents governing the plan).

## CLASS ACTION ALLEGATIONS

61.   29 U.S.C. § 1132(a)(2) authorizes any participant or beneficiary of the Plan to bring an action individually on behalf of the Plan to obtain for the Plan the remedies provided by 29 U.S.C. § 1109(a). Plaintiff seeks certification of this action as a class action pursuant to this statutory provision and Fed. R. Civ. P. 23.

62.   Plaintiff asserts his claims in Counts I–II on behalf of a class of participants and beneficiaries of the Plan defined as follows:[13]

> All participants and beneficiaries of the SEI Capital Accumulation Plan at any time on or after September 27, 2012, excluding Defendants and employees with responsibility for the Plan's investment functions.

63.   Numerosity:   The Class is so numerous that joinder of all Class members is impracticable. The Plan had approximately 2,600 to 3,400 participants during the applicable period.

64.   Typicality:   Plaintiff's claims are typical of the Class members' claims. Like other Class members, Plaintiff is a Plan participant and suffered injuries as a result of Defendants' mismanagement of the Plan. Defendants treated Plaintiff consistently with other Class members with regard to the Plan. Defendants' imprudent and disloyal decisions affected all Plan participants similarly.

65.   Adequacy:   Plaintiff will fairly and adequately protect the interests of the Class. Plaintiff's interests are aligned with the Class that he seeks to represent. He has retained

---

[13] Plaintiff reserves the right to propose other or additional classes or subclasses in his motion for class certification or subsequent pleadings in this action.

counsel experienced in complex class action litigation, including ERISA litigation. Plaintiff does not have any conflicts of interest with any Class members that would impair or impede his ability to represent such Class members.

66.    <u>Commonality</u>:  Common questions of law and fact exist as to all Class members and predominate over any questions solely affecting individual Class members, including but not limited to:

    a.    Which Defendants are fiduciaries of the Plan;

    b.    Whether the Plan's fiduciaries breached their fiduciary duties by engaging in the conduct described herein;

    c.    Whether the Plan's fiduciaries are additionally or alternatively liable, as co-fiduciaries, for the unlawful conduct described herein pursuant to 29 U.S.C. § 1105;

    d.    Whether SEIC and the Design Committee breached their duty to monitor other Plan fiduciaries;

    e.    The proper form of equitable and injunctive relief; and

    f.    The proper measure of monetary relief.

67.    Class certification is appropriate under Fed. R. Civ. P. 23(b)(1)(A) because prosecuting separate actions against Defendants would create a risk of inconsistent or varying adjudications with respect to individual Class members that would establish incompatible standards of conduct for Defendants.

68.    Class certification is also appropriate under Fed. R. Civ. P. 23(b)(1)(B) because adjudications with respect to individual Class members, as a practical matter, would be dispositive of the interests of the other persons not parties to the individual adjudications or

would substantially impair or impede their ability to protect their interests. Any award of equitable relief by the Court, such as removal of particular Plan investments or removal of a Plan fiduciary, would be dispositive of non-party participants' interests. The accounting and restoration of the property of the Plan that would be required under 29 U.S.C. §§ 1109 and 1132 would be similarly dispositive of the interests of other Plan participants.

69.     Class certification is also appropriate under Fed. R. Civ. P. 23(b)(3) because questions of law and fact common to the Class predominate over any questions affecting only individual Class members, and because a class action is superior to other available methods for the fair and efficient adjudication of this litigation. Defendants' conduct as described in this Complaint applied uniformly to all members of the Class. Class members do not have an interest in pursuing separate actions against Defendants, as the amount of each Class member's individual claims is relatively small compared to the expense and burden of individual prosecution, and Plaintiff is unaware of any similar claims brought against Defendants by any Class members on an individual basis. Class certification also will obviate the need for unduly duplicative litigation that might result in inconsistent judgments concerning Defendants' practices. Moreover, management of this action as a class action will not present any likely difficulties. In the interests of justice and judicial efficiency, it would be desirable to concentrate the litigation of all Class members' claims in a single forum.

## COUNT I
### Breach of Duties of Loyalty and Prudence
### 29 U.S.C. § 1104(a)(1)(A)–(B)

70.     Defendants are fiduciaries of the Plan under 29 U.S.C. §§ 1002(21) and 1102(a)(1).

71.     29 U.S.C. § 1104 imposes fiduciary duties of prudence and loyalty upon the Defendants in their administration of the Plan and in their selection and monitoring of Plan investments.

72.     The scope of the fiduciary duties and responsibilities of the Defendants includes managing the assets of the Plan for the sole and exclusive benefit of Plan participants and beneficiaries, defraying reasonable expenses of administering the Plan, and acting with the care, skill, diligence, and prudence required by ERISA. Defendants were directly responsible for selecting prudent investment options, evaluating and monitoring the Plan's investments on an ongoing basis and eliminating imprudent ones, and taking all necessary steps to ensure that the Plan's assets were invested prudently. This includes "a continuing duty to monitor investments and remove imprudent ones[.]" *Tibble*, 135 S. Ct. at 1829.

73.     As described throughout this Complaint, Defendants failed to employ a prudent and loyal process for selecting, monitoring, and reviewing the Plan's designated investment alternatives, by prioritizing SEI's proprietary investments over superior available options, and by failing to objectively evaluate the expected performance and fees of the Plan's investments in comparison to other investment options. Defendants imprudently and disloyally selected and retained investment options in the Plan that benefited SEI but disserved participants, compared to similar options available in the marketplace.

74.     Each of the above-mentioned actions and failures to act described throughout the Complaint demonstrate Defendants' failure to make Plan investment decisions based solely on the merits of each investment and in the interest of Plan participants. These failures were flagrant and intentional.  Throughout the Class Period, Defendants' conduct and decisions were driven by their desire to drive revenues and profits to SEI and to promote SEI's business interests. Through these actions and omissions, the Defendants failed to discharge their duties with respect to the Plan solely in the interest of the participants and beneficiaries of the Plan, and for the exclusive purpose of providing benefits to participants and their beneficiaries and defraying reasonable expenses of administering the Plan, in violation of their fiduciary duty of loyalty under 29 U.S.C. § 1104(a)(1)(A).

75.     Each of the above actions and omissions described in this Complaint further demonstrate that Defendants failed to discharge their duties with respect to the Plan with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent person acting in a like capacity and familiar with such matters would have used in the conduct of an enterprise of like character and with like aims, thereby breaching their duties under 29 U.S.C. § 1104(a)(1)(B).

76.     The foregoing fiduciary breaches resulted in millions of dollars in losses to the Plan.  Further, SEI profited from these fiduciary breaches by receiving investment management fees they otherwise would not have received, as a result of Defendants' imprudent and disloyal retention of SEI-affiliated funds in the Plan.

77.     Each Defendant is personally liable, and the Defendants are jointly and severally liable, under 29 U.S.C. §§ 1109(a), 1132(a)(2), and 1132(a)(3), to make good to the Plan the losses resulting from the aforementioned breaches, to restore to the Plan any profits Defendants

made through the use of Plan assets, and to restore to the Plan any profits resulting from the breaches of fiduciary duties alleged in this Count.

78.     Each Defendant knowingly participated in each breach of the other Defendants, knowing that such acts were a breach, enabled the other Defendants to commit breaches by failing to lawfully discharge such Defendant's own duties, and knew of the breaches by the other Defendants and failed to make any reasonable and timely effort under the circumstances to remedy the breaches. Accordingly, each Defendant is also liable for the losses caused by the breaches of its co-fiduciaries under 29 U.S.C. § 1105(a).

## COUNT II
### Failure to Monitor Fiduciaries

79.     Defendants SEIC and the Plan Design Committee are fiduciaries of the Plan under 29 U.S.C. §§ 1002(21) and/or 1102(a)(1).

80.     Defendant SEIC had (and retains) ultimate authority over the management of the Plan. SEIC appointed members of the Design Committee, who appointed members of the Investment Committee and Administration Committee. SEIC also received periodic investment performance reports from the Investment Committee, and had the authority to receive periodic reports on other actions of the committee Defendants. SEIC had a fiduciary duty to monitor appointed fiduciaries.

81.     Defendant Design Committee had authority over the Investment Committee and the Administration Committee.  The Design Committee appointed members of the Investment Committee and the Administration Committee, and received periodic reports on their actions with respect to the Plan. The Design Committee had a fiduciary duty to monitor appointed fiduciaries.

82. A monitoring fiduciary must ensure that the monitored fiduciaries are performing their fiduciary obligations, including those with respect to the investment and monitoring of plan assets, and must take prompt and effective action to protect the plan and participants when the monitored fiduciaries fail to perform their fiduciary obligations in accordance with ERISA.

83. SEIC and the Design Committee breached their fiduciary monitoring duties by, among other things:

    a) Failing to monitor and evaluate the performance of the Plan's fiduciaries or have a system in place for doing so, standing idly by as the Plan suffered substantial losses as a result of Defendants' imprudent actions and omissions;

    b) Failing to monitor its appointees' fiduciary processes, which would have alerted a prudent fiduciary to the breaches of fiduciary duties described herein; and

    c) Failing to remove fiduciaries whose performance was inadequate in that they continued to maintain investments that a prudent fiduciary would not have retained in the Plan, all to the detriment of the Plan and Plan participants' retirement savings.

84. As a consequence of the foregoing breaches of the duty to monitor, the Plan suffered millions of dollars per year in losses due to investment underperformance.

85. Pursuant to 29 U.S.C. § 1109(a), 1132(a)(2), and 1132(a)(3), SEIC and the Design Committee are liable to restore to the Plan all losses suffered as a result of the fiduciary breaches that resulted from their failure to properly monitor the Plan's fiduciaries.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff, individually and as the representative of the Class defined herein, and on behalf of the Plan, prays for relief as follows:

A.    A determination that this action may proceed as a class action under Rule 23(b)(1), or in the alternative, Rule 23(b)(3) of the Federal Rules of Civil Procedure;

B.    Designation of Plaintiff as Class Representative and designation of Plaintiff's counsel as Class Counsel;

C.    A declaration that Defendants have breached their fiduciary duties under ERISA;

D.    A declaration that SEIC and the Design Committee breached their fiduciary duty to monitor appointed fiduciaries;

E.    An order compelling Defendants to personally make good to the Plan all losses that the Plan incurred as a result of the breaches of fiduciary duties described above, and to restore the Plan to the position it would have been in but for this unlawful conduct;

F.    An accounting for profits earned by Defendants and a subsequent order requiring SEI to disgorge all profits received from, or in respect of, the Plan;

G.    Other equitable relief to redress Defendants' illegal practices and to enforce the provisions of ERISA as may be appropriate;

H.    An award of pre-judgment interest;

I.    An award of attorneys' fees and costs pursuant to 29 U.S.C. § 1132(g) and/or the common fund doctrine;

J.    An award of such other and further relief as the Court deems equitable and just.

Dated: September 28, 2018

Peter Winebrake, Attorney ID No. 80496
R. Andrew Santillo, Attorney ID No. 93041
Mark J. Gottesfeld, Attorney ID No. 307752
**WINEBRAKE & SANTILLO, LLC**
Twining Office Center, Suite 211
715 Twining Road
Dresher, PA 19025
Phone: 215-884-2491
pwinebrake@winebrakelaw.com
asantillo@winebrakelaw.com
mgottesfeld@winebrakelaw.com


Paul J. Lukas, MN Bar No. 022084X*
Kai H. Richter, MN Bar No. 0296545*
Brock Specht, MN Bar No. 0388343*
Carl F. Engstrom, MN Bar No. 0396298*
Sarah J. Demers, MN Bar No. 0392149*
      * *pro hac vice applications forthcoming*
**NICHOLS KASTER, PLLP**
4600 IDS Center
80 S 8th Street
Minneapolis, MN 55402
Telephone: 612-256-3200
Facsimile: 612-338-4878
lukas@nka.com
krichter@nka.com
cengstrom@nka.com
sdemers@nka.com

ATTORNEYS FOR PLAINTIFF